IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LUIGI E. AIELLO and JOSHUA
SCOLMAN,

                          Plaintiffs,              OPINION AND ORDER

       v.                                          13-cv-562-wmc

KELLY WEST, CATHY A. JESS, and
PAUL LUDVIGSON,

                          Defendants.

       In this proposed class action, plaintiffs Luigi E. Aiello and Joshua Scolman are

proceeding on claims that certain employees of the Wisconsin Department of Corrections

("DOC") violated their rights under the First Amendment and specific provisions of the

Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et

seq.*.  Generally, plaintiffs allege violation of those rights by (1) limiting access to Shabbat

services, (2) denying Seder meals at Passover and (3) reducing the number of ready-to-eat

kosher meals.

       This opinion will address three, currently pending motions:  (1) plaintiffs' renewed

motion for assistance in recruiting counsel (dkt. #27), which will be granted; (3)

plaintiffs' motion for summary judgment (dkt. #37), which will be denied; and (4)

defendants' motion for summary judgment (dkt. #53), which will be granted in part and

denied in part.  As a result of these rulings, the sole claim remaining for trial relates to

Shabbat services.  Once counsel is recruited, the court will schedule a telephonic

conference to discuss (1) whether plaintiffs wish to continue to pursue class certification

and (2) how trial will proceed.

1

UNDISPUTED FACTS[1]

## I.    The Parties

At all relevant times for purposes of this lawsuit, plaintiffs have been confined at the Waupun Correctional Institution ("WCI").  Defendant Kelli West is the "Religious Practices Coordinator" for the DOC Division of Adult Institutions ("DAI").  Defendant Cathy A. Jess is the "Administrator of the DAI."  Among other things, she is responsible for the creation and implementation of the challenged DAI policies.  Defendant Paul Ludvigson is the "Corrections Program Director" at WCI, responsible for the programming needs of inmates, which includes religious programming.

## II.   Relevant DOC Policies

DOC DAI Policy #309.61.01 establishes "umbrella religion groups" ("URG") for accommodation, which include Protestant, Islam, Native American, Catholic, Jewish, Eastern Religions and Pagan.  Inmates may designate any religious preference while incarcerated, and they may change their designation every six months.  Regardless of their specific URG designation, they may also engage in individual faith practice or study.  Aiello's religious preference at WCI has always been Jewish.  Up until 2014, Scolman's preference was also Jewish, but in May of 2014, he changed his religious preference to Pagan.

Among its provisions, DAI Policy #309.61.01 states that "[u]nder no circumstances will inmates be authorized to lead or conduct a Religious Service or Study

---

[1] The following facts are material and undisputed, unless otherwise noted.  The facts are drawn from the parties' proposed findings of fact, the defendants' supplemental proposed findings of fact and the underlying evidentiary support submitted by both sides.

Group."  Instead, a religious service for a particular umbrella religion group must be led "by a qualified person of *that particular Umbrella Group Religion*."  (Emphasis in original.) According to defendants, the ban on inmate-led services was adopted in 2001 because of security problems that arose when individual inmates differentiated themselves as leaders of a particular religious sect, including prison security being threatened.  More generally, there appears to be no dispute that perceived power differentials among inmates can create the potential for violence, attempts to control the actions of other inmates, gang activity or other unlawful activity, such as the introduction of contraband and group resistance.  As related to gang activity in particular, defendants state that DOC has historically had problems with gangs attempting to take over religious groups. Additionally, defendants state that inmate-led groups have previously disrupted the power dynamics in prison, blurring the line between the staff and leader-inmates.

## III.   Availability of Shabbat Services at WCI

Shabbat is a ritual observance in Judaism that is a day of rest and spiritual enrichment, which occurs on the seventh day of the week.   Under DAI Policy #309.61.01, only a Jewish rabbi may facilitate a Shabbat or other service, but a chaplain or another staff member may facilitate a Jewish study group.  As the Religious Practices Coordinator, defendant West has, therefore, recommended that chaplains should hold a study group to provide a religious accommodation when a Jewish spiritual leader is unavailable to lead a worship service, including Shabbat.  This practice was and is not unique to Jewish services, but rather is the approach taken with respect to all recognized religions.

From 2004 through 2006, Friday Shabbat services took place in the WCI chapel and included matzah, candles and grape juice. Despite the fact that DAI Policy #309.61.01 was in effect, Aiello was permitted to meet with up to four other inmates in the resource room from 2005 to 2006 under the supervision of WCI Chaplains. This room is walled with windows, equipped with a microphone and located across from an officer's station. As a result, chapel staff watched and listened to Aiello and his fellow inmates during their weekly services. Aiello states that during the inmate-led sessions he participated in, there were never any incidents.

In 2006, however, Shabbat services were discontinued altogether due to a lack of a volunteer Jewish leader. Instead, matzah and grape juice were sent to the inmates' cells for a period of time until WCI obtained a rabbi to lead weekly services. Eventually, WCI engaged Rabbi Mosheh Stallman for services, and he led the weekly services on Thursdays until December 2011. From late 2011 into early 2012, Jewish inmates, including Aiello and Scolman, were permitted to attend weekly services led by non-Jewish chaplains, Dr. Sam Appau and Chaplain Francis Paliekara. Unfortunately, Appau left in December 2012. At that point, WCI again had no other volunteer to supervise the weekly Shabbat services.

In January 2013, Rabbi Mitchell Cohen volunteered to supervise Jewish services. He conducted services routinely two Thursdays per month, and during the weeks that Cohen was not present for services, inmates were permitted to attend the chapel. In February 2013, however, Chaplain Paliekara informed the inmates at WCI that they could no longer attend chapel during Rabbi Cohen's off weeks. Rabbi Cohen served as

the Jewish volunteer until July 2015, taking a break between September 2013 and January 2014.  WCI does not have a current Rabbi volunteer but defendants state that they are continually seeking to fill the void.[2]

Since Rabbi Cohen left in July of last year, Chaplain George has made attempts to locate a volunteer by informing defendant West of the need, as well as asking the Milwaukee Jewish center and the Aleph institute for volunteers.  As a substitute for group Shabbat services, inmates may also request time in the resource room for a prayer session or to attend a service through an electronic medium such as video tapes and/or DVDs. As mentioned, the resource room is across from an officer's station, but current policy provides that inmates may only watch the videos individually -- not as a group.

## IV.   Seder Observance at WCI

The Jewish faith observes Seder during the first two nights of the annual Passover holiday.  The Seder ritual meal involves eating certain symbolic foods, including a shank bone, lettuce, hard-boiled eggs, nuts, apples, spices and bitter herbs.  The meal also involves recitation of blessings, ritualistic hand washing and readings from the Bible. According to Aiello, observance of Seder "is the most important and vital component of the Passover holiday."  (Aiello Decl., dkt. #41, ¶ 18.)

Under DOC Policy, all URGs may have an "Annual Religious Celebratory Meal/Observance," if required by that religion.  DOC does not, however, provide foods of

---

[2]  Plaintiffs also point out that inmates no longer receive matzah and grape juice in their cells on a weekly basis because the supplies have run out.  They do not, however, contend that the lack of these food items constitutes a substantial burden on their religious practice; their focus related to Shabbat services is that they cannot carry them out in a group setting.  Accordingly, this fact is not material for purposes of summary judgment.

special or cultural significance for any annual celebration.[3]   Instead, "[a]n approved celebratory meal will consist of a regular institution/center meal."  DAI Policy 309.61.01.  Despite this, DOC's Religious Practices Advisory Committee ("RPAC") and DAI leadership learned that some institutions were nevertheless purchasing special Seder foods for Jewish inmates, leading to a concern that these institutions were giving preference to Jewish inmates.

Apparently WCI was one of the facilities that violated DOC's written policy, because Chaplain Francis issued a memo on January 31, 2013, stating that the general policy would be followed.  Going forward, the Chaplain's memo also advised that:  WCI would be denying individual Seder plate items through donations; inmates could not purchase the ingredients for the Seder meal; and as an alternative during the Seder ritual meal, inmates would receive a picture of a Seder plate.  After Chaplain Paliekara and Rabbi Cohen voiced concerns about these changes with defendant West at DAI in February of 2013, Rabbi Cohen was ultimately allowed to donate a single communal Seder plate.[4]

---

[3]  For Jewish inmates that sign up for it, Kosher-for Passover meals (meals with no leavening agents) also are available for the nine days of Passover.

[4]  Although plaintiffs purport to "dispute" that Rabbi Cohen provided them with a communal plate in 2013, their own evidence belies that.  For example, while Aiello states in his declaration that as of the January 31, 2013, memo, donations were not permitted, he also states that in a subsequent memorandum Rabbi Cohen *was* permitted to bring in the ingredients for one Seder plate.  (Aiello Decl., dkt. #41 at 5.)  Additionally, one of the documents plaintiffs attached to their complaint, a supplement to Aiello's inmate complaint, states that Rabbi Cohen "acquiesced" to the congregate Seder service.  (Compl., Ex. 37, dkt. #1-2, at 113.)  There is also agreement that the picture of the Seder plate was not included, whether because it was deemed unnecessary given the presence of a communal plate or just an empty (even potentially offensive) gesture.

On July 1, 2013, after inmates complained about the policy change, DAI Policy #309.61.02 was also updated to include Seder plate food items in the Religious Property Chart.  This policy change officially permitted Rabbi Cohen to bring in a communal plate when he came to WCI to perform the Seder ritual.  Thus, in 2013, in 2014 and 2015, Rabbi Cohen presided over the Seder ritual meal, at which a communal plate was available to participants.

On January 1, 2016, a new version of DAI Policy #309.61.03 became effective. This policy now states that inmates may request individual accommodation to purchase an individual portion of a shelf-stable, ceremonial food item for personal consumption in conjunction with the URG Annual Religious Celebratory Congregate Meal.  To obtain the accommodation, an inmate must submit a form at least 90 days before the event and list the requested food item, the religious/spiritual/ceremonial significance, the source of the food item, the individual portion cost, the delivery method and charges, as well as any possible substitutions.  Aiello and Scolman are both aware of this policy change; Scolman has stated that he has no plan to participate because he is now Pagan.

## V.    Kosher Diet Accommodations

DOC inmates may request a diet that comports with their personal religious beliefs.  For example, inmates designating a Jewish URG preference have the option to request a Kosher diet.  Because DOC facilities do not have kitchens that comply with Kosher rules for separation of dairy and meat, the DOC follows the Academy of Nutrition and Dietetics ("AND") guidelines for serving Kosher meals in non-Kosher commercial kitchens.  To that end, the DOC Kosher menu includes pre-packaged

7

certified-Kosher entrees, individual serving-size products, separate preparation and double-wrapping of side dishes and disposables for serving.  To follow AND, DOC serves milk with the meatless morning and evening meals.  Because the midday meals often contain meat, however, dairy products are never served with that meal.

Before 2012, inmates who kept Kosher at WCI received two ready-to-eat warm Kosher meals per day.  DOC then changed the Kosher menu.  Before the change, the evening meal included two slices of bread and one of a variety of warm Kosher entrees, but after the change, the evening meal was substituted with a cold, prepackaged meatless Kosher bag meal, containing among other items, saltines, graham crackers, jelly and peanut butter.

Defendants explained that this change occurred for four reasons:  (1) to make the caloric and nutritional content of Kosher meals consistent with the general, plant-based and halal menus; (2) to save kitchen labor and resources; (3) to reduce costs; and (4) to replace powdered milk with liquid milk provided by the DOC dairy.

As for nutrition, defendants' position is that the current Kosher diet exceeds the DOC's nutritional goals.  DOC uses the brand "My Own Meals" for the Kosher entrees, and supplements those entrees with fruit, vegetables and beverages.  Although Scolman disputes the nutritional value of the changed Kosher menu, as explained further below, his evidence does not effectively dispute the fact that the average caloric value of the current Kosher diet exceeds the DOC's nutritional goal of 2500-2750 calories per day.

As for resource and cost savings, defendants offer evidence that:  (1) the cost of Kosher meals is markedly greater than other meals; and (2) the change in the Kosher diet

was intended to even out the costs among the different diet plans. Specifically, defendants point out that as of November 2015, one halal meal cost $1.06, one Ramadan meal cost $1.13, one Kosher for Passover meal cost $4.13; one plant-based meal cost $0.88 and one general meal cost $0.92. In contrast, one Kosher meal, including the prepackaged entrée and additional produce and beverage, is approximately $3.68. Moreover, from 2008 to 2012, the annual expenditure on Kosher means increased from $73,540.20 to $504,904.50.

Finally, as for the switch to liquid milk, DOC represents it stopped using powdered milk because inmates had begun using it as a commodity, creating a security risk. Apparently, this is because powdered milk is valued by some inmates, who use it for body-building purposes.

Plaintiffs dispute each of these stated justifications for the change, except for cost savings. However, plaintiffs only cite as support Aiello's affidavit and defendants' internal correspondence, which actually describe all of defendants' justifications, not just the reduction in costs. (Pl. PFOF, dkt. #39, ¶¶ 30-31.) Plaintiffs further claim that the change targeted Jewish inmates alone, because no other religious diet or meal -- Halal or plant-based -- contains saltines, graham crackers, packets of jelly and peanut butter. More specifically, plaintiffs assert that Muslim and vegetarian inmates on the halal diet continue to receive hot meal entrees in both their lunch and evening meals. Scolman in particular avers that he abandoned the Jewish faith and became Pagan because he became frustrated with what he felt were inadequacies in the Kosher diet and prayer services.

While acknowledging that he is not a dietitian or nutritionist, Scolman further claims that the meal change lacks sufficient calories.

OPINION

## I.    Summary Judgment

Plaintiffs claim that their rights under the First Amendment and RLUIPA are being violated by:  (a) WCI's refusal to allow inmates-led Shabbat services; (b) the restrictions on the availability of Seder food items; and (c) the change in Kosher meals. The parties both seek summary judgment of all claims in their favor.  Both the First Amendment and RLUIPA analyses involve balancing religious freedoms against government interests in their impingement.  As the more exacting of the two standards, though affording only prospective relief, the court will center its liability analysis on plaintiffs' RLUIPA claims.

The relevant section of RLUIPA provides in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

In recent cases the United States Supreme Court has defined "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether

alternative means of religious exercise are available. *Holt v. Hobbs,* 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751, 2775 (2014)). Unfortunately, as has been pointed out previously, the term "seriously" provides little more guidance than "substantial burden," but the Seventh Circuit advises that something more than just a "modest" violation is required. *Schlemm v. Wall,* 784 F.3d 362, 365 (7th Cir. 2015).

As set forth above, if a prisoner satisfies this initial burden, then the burden shifts to the government to demonstrate that the policy is the least restrictive means of furthering a compelling government interest. *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). In making this determination, the Supreme Court advises that "[c]ontext matters." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). Courts must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures . . . consistent with consideration of costs and limited resources." *Id.* As Justice Sotomayor cautioned in Holt, however, this deference "does not extend so far that prison officials may declare a compelling interest by fiat." *Holt*, 135 S. Ct. at 867 (Sotomayor, J., concurring) (internal quotations omitted); *see also Schlemm*, 784 F.3d at 365 ("Saving a few dollars is not a compelling interest, nor is a bureaucratic desire to follow the prison system's rules. The Act requires prisons to change their rules to accommodate religious practices; rules' existence is not a compelling obstacle to change.").

Accordingly, this court applies a test balancing plaintiff's proof of a substantial burden on his religious exercise and defendants' proof that any burden is the least

11

restrictive means of furthering a compelling interest.  For the reasons set forth below, the court finds that entry of summary judgment in defendants' favor is appropriate on all issues, save for one of the plaintiff's RLUIPA claims related to Shabbat services, which will require a bench trial.  *See* Fed. R. Civ. P. 56(a).

### A.    Shabbat Services

#### 1.    RLUIPA

Plaintiff Aiello claims that DOC's refusal to allow inmate-led Shabbat services violates RLUIPA and their First Amendment right to Free Exercise.[5]  As an initial matter, the parties do not dispute that Shabbat services have not occurred since July of 2015 because:  (1) inmates are prohibited from leading religious services; and (2) WCI has not been able to secure a volunteer to conduct them.   Therefore, the question becomes whether Aiello's loss of Shabbat services outweigh the defendants' interest in prohibiting their being led by an inmate, or whether a less restrictive means might serve that interest just as effectively.

##### a.    Substantial Burden

To prove substantial burden under both RLUIPA and the Free Exercise Clause of the First Amendment, Aiello asserts that WCI's ban on inmate-led Shabbat services "seriously violates" his religious beliefs.  (Pl. Br., dkt. #38, at 19-21.)  In response, defendants initially argue plaintiff offered insufficient evidence that requiring a volunteer to lead the Shabbat services has rendered his religious exercise impracticable.   For

---

[5] As previously noted, the other plaintiff, Scolman, consistent with his now practicing the Pagan religion, acknowledged that he is *not* pursuing a claim related to Shabbat services (Scolman Dep., dkt. #78, at 36-38), and so this claim is limited to Aiello only.

example, defendants point out plaintiff is still able to practice his Jewish beliefs within WCI in a number of meaningful ways, including:  (1) submitting religious diet requests, (2) individual study, (3) personal meditation, (4) utilization of religious books and/or property, (5) celebration of a religious feast, (6) individual religious observance in their living quarters, (7) correspondence with fellow believers, (8) pastoral visits, and (9) requesting to abstain from work or program on religious days of observance.   As explained by the Supreme Court in *Holt*, and recognized by this circuit in *Schlemm*, however, this argument is a non-starter, since RLUIPA covers "any exercise of religion." 135 S. Ct. at 860; 784 F.3d at 364.  Therefore, listing other ways in which plaintiffs may practice their Jewish faith does not diminish the impact of being denied another one of their substantial religious exercises.  *Id*.

Defendants also point out that religious services and study groups are available through DVDs and teleconferencing, including a Shabbat service video that inmates can watch in the resource room if they submit a request form.   While defendants acknowledge that plaintiff cannot view videos in a group, they suggest this is a "minimal burden" on his religious practice necessitated by legitimate security concerns with permitting inmates in leading religious services.   Yet Aiello's description of Shabbat services -- which involve blessings, recitations of a Jewish hymn, scripture readings related to the Shabbat day, ritualistic washing of the hands, and drinking grape juice (in lieu of wine) – underscore the significance of in-person, group services.  Accordingly, plaintiff has made a *prima facie* case that the loss of in-person, group Shabbat services constitutes a substantial burden on the practice of his Jewish faith.

Even so, the evidence plaintiff has submitted thus far is quite thin -- consisting only of Aiello's statements that he previously participated in group practices and the conclusory statement that the ban "seriously violates" his religious practices. Thus, while summary judgment in defendants' favor on this issue is inappropriate, more evidence of the importance of weekly, in-person and group Shabbat services will be necessary for plaintiff to establish a substantial burden at trial.[6]

### b.      Least Restrictive Means

The next question under RLUIPA is whether defendants are able to establish that the ban on inmate-led group services is the least restrictive means to further a compelling interest in maintaining a secure institution. Unsurprisingly, the Seventh Circuit has already held that a prison has a compelling interest in maintaining security. *See Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006). Moreover, plaintiff Aiello has not rebutted defendants' evidence that inmate-led groups have historically created security risks because: (1) power differentials arise among inmates when some are designated as leaders; (2) gang activity can infiltrate into inmate-led groups; and (3) the lines blur between inmates and prison staff.

Of course, this by no means proves there was (and is) no (or an acceptable) risk from Aiello being allowed to continue to do so. At least so far, defendants have also failed to meet their burden of showing that a general ban on inmate-led services is the

---

[6] For instance, Aiello must provide more context for the court to find the importance of Shabbat services in a group setting. Rather than simply stating that the lack of group services "seriously violates" his religious beliefs, plaintiff will need to explain the significance of Shabbat services to his practice of Judaism, and how the lack of in-person group services makes the practice of this ritual impossible or at least substantially less meaningful.

*least restrictive means* of addressing that risk.  In particular, defendants do not dispute that Aiello and a group of two to four other Jewish inmates had, without incident, been permitted in the past to lead their own services in the resource room with staff from the chapel watching and listening from a nearby officer's station.  Nor do defendants explain why Aiello had been permitted to meet with other inmates without a supervisor leading the meetings, nor why this previous method of permitting inmates to congregate in small groups in the resource room is no longer feasible.

Instead, defendants argue that the DOC cannot create case-by-case exceptions to the ban simply because some groups held inmate-lead religious services without incident. Yet that is, apparently, exactly what the DOC had been doing.  Left unexplained by defendants is what changes and why the officer stationed near the resource room, who is currently available to supervise one inmate at a time, is somehow now incapable of supervising more than one inmate at a time in the resource room, especially given that there is both an audio and visual feed to the room.  While the prison is certainly afforded deference in how it chooses to pursue its interest in maintaining security, its outright ban leaves at least one seemingly feasible, less restrictive alternative unaddressed.

While not identical, the current facts are arguably similar to those recently confronted by the Seventh Circuit in *West v. Grams*, 607 Fed. Appx. 561 (7th Cir. 2015). In *West*, a Muslim inmate brought suit under the First Amendment and RLUIPA, claiming in part that the staff at the Columbia Correctional Institution cancelled Islamic services when Muslim staff or outside volunteers were unavailable to lead the services. *Id.* at 563.  The district court granted summary judgment against the plaintiff for the

15

RLUIPA claim as moot because he was transferred, but the Seventh Circuit vacated and remanded the decision.

In remanding, the *West* court commented, albeit in dicta, that it appeared the defendants had not yet met their burden of establishing that banning inmate-led services was the least restrictive means of furthering their security interest. Of particular note for purposes of this case, the court observed "what little evidence the defendants offered was cut down by their admission that in the past the volunteer policy had not been enforced and that Muslim inmates were allowed to lead religious services on a rotating basis." *Id.* at 567.

Since defendants did not explicitly disavow the fact that inmate-led groups have previously been allowed to meet in the resource room without incident, a trier of fact might reasonably infer that there are other measures available that would permit inmates to meet at least in small groups without an outside volunteer in the room with them. At the very least, defendants have not met their burden of establishing that the general ban on inmate-led groups is narrowly tailored. With this genuine issue of material fact still at issue, summary judgment will be denied for both plaintiffs and defendants on Aiello's RLUIPA claim.

2.      **Free Exercise Clause**

In contrast, summary judgment in defendants' favor as to the plaintiffs' Shabbat services claim under the First Amendment is appropriate.[7]  Like the claim brought under RLUIPA, to establish a Free Exercise violation, plaintiffs must demonstrate that defendants' prohibition on inmate-led Shabbat services "placed a substantial burden on [their] religious practices."  *Thompson v. Holm*, No. 15-1928, 2016 WL 29047, at *3 (7th Cir. Jan. 4, 2016).   Under their First Amendment claim, however, plaintiffs carry the additional burden of showing that the law is targeted against a religion or religious practice.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("[A] law that is neutral and of generally applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.").   Finally, plaintiffs also must show that the burden on their rights is "not reasonably related to a legitimate penological interest."  *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).[8]

As already discussed above, Aiello has established a *prima facie* case that limiting inmate-led Shabbat services placed a substantial burden on his religious beliefs given the lengthy periods when outside, volunteer leaders were unavailable.  Nonetheless, summary judgment in favor of defendants is appropriate as to plaintiffs' Free Exercise claim for

---

[7] Since the First Amendment affords relief for past infringement of religious rights, both plaintiffs assert this claim with regard to impinging Shabbat services, notwithstanding Scolman's subsequent conversion to the Pagan religion.

[8] In assessing whether the regulation is reasonably related to legitimate penological interests, courts consider:  (1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the right will have on guards and other inmates and on the allocation of prison resources generally; and (4) whether there are ready alternatives to the regulation.  *Turner,* 482 U.S. at 89-90.

three reasons.  *First,* DOC's ban on inmate-led groups is a rule of general applicability.  Thus, it applies to *any* inmate-led group, not just religious groups.  *See Hialeah*, 508 U.S. at 531.  Since plaintiffs present no evidence to the contrary, their Free Exercise claim fails for that reason.

*Second*, plaintiffs have not established that the ban on inmate-led groups is unrelated to a legitimate penological interest.  To the contrary, defendants have established -- and, as noted, plaintiffs do not provide evidence to rebut -- that inmate-led groups create a potentially serious security risk, and the ban is reasonably related to preventing that security risk.  In particular, WCI's Security Director since 2012, Anthony Meli, avers that inmate-led group meetings create several security risks that volunteer-led meetings do not, including:  (1) inmate leaders may create a hierarchy among inmates, which could lead to struggles for dominance; (2) inmate leaders may use their forum to provoke other inmates and create disturbances; (3) inmate leaders could use the chapel as a venue for gang or racial hate group communications; (4) gang leaders may use their position to organize illegal activities; (5) inmate leaders may gain personal information about other inmates and use it against them; (6) inmate leader religious or spiritual knowledge cannot be confirmed; and (7) inmate leaders could more easily permit contraband to be passed during group meetings.  Meli adds that before the ban on inmate-led groups, serious security problems arose that included instances where the leader became disrespectful of staff and had the potential to lead to disturbances and violence.  (Meli decl., dkt. #39, ¶ 9.)  Defendants' reliance on Meli, who is not a defendant in this lawsuit and in a reliable position to speak to WCI's security needs,

establishes a rational relationship between the security interest and the ban on inmate-led groups.

While plaintiffs point to a past practice of allowing such groups without incident, at least in smaller numbers, the First Amendment, unlike RLUIPA, does not require defendants to prove that this was the least restrictive means to maintain security. Indeed, the Seventh Circuit and other circuits had approved of general bans on inmate-led religious services in the face of past Free Exercise challenges. *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988); *Hadi v. Horn*, 830 F.2d 779, 784-87 (7th Cir. 1987); *Spies v. Voinovich*, 173 F.3d 398, 405-06 (9th Cir. 1997); *Benjamin v. Coughlin*, 905 F.2d 571, 577-78 (2d Cir. 1990); *Butler-Bey v. Frey*, 811 F.2d 449, 452 (8th Cir. 1987). Accordingly, even if the ban applied only to religious group meetings, plaintiffs' claim would fail because the ban is related to WCI's legitimate security interests.

*Third*, and finally, even if plaintiffs had met their burden to show a First Amendment violation, the defendants would be entitled to qualified immunity. As defendants point out, there are no cases that suggest, much less state outright, that Jewish inmates have a clearly established constitutional right to inmate-led religious services. In fact, the Seventh Circuit recently affirmed a finding of summary judgment on qualified immunity grounds with respect to a claim challenging a ban on inmate-led groups brought by Muslim inmates. *Turner v. Hamblin,* 590 Fed. Appx. 616 (7th Cir. 2014). Presuming that attending weekly services was a fundamental tenet of Islam, the Seventh Circuit explained that its existing case law, such as *Johnson-Bey* and *Hadi,* held prisons can constitutionally preclude inmates from leading services for security reasons.

### B.    Seder Plate

Plaintiffs also assert a right to carry out the Seder ritual under both RLUIPA and the Free Exercise clause of the First Amendment.  As neither plaintiff submitted evidence permitting a finding that the 2013-2015 or 2016 policy regulating inmates' access to Seder food items creates a substantial burden on their ability to carry out the Seder ritual, summary judgment in defendants' favor is appropriate.

According to Aiello, the Seder meal and surrounding ritual is the most important and necessary ritual of the Jewish Passover holiday.[9]  Defendants do not dispute that eating certain food is a necessary part of the Seder ritual.  Rather, they contend that plaintiffs have had access to traditional Seder plate items under both the old and new DOC policies, and plaintiffs failed to rebut that evidence.

Under the policy in effect in 2013, 2014 and 2015, plaintiffs had the ability to participate in a communal food plate as a part of the Seder ritual that Rabbi Cohen led. Moreover, plaintiffs provide no evidence that a communal plate somehow does not meet the Seder eating requirement, nor do they suggest that a certain minimum quantity of food per person is necessary.  Although Scolman states that he abandoned the Jewish faith because of the difficulties he encountered in obtaining the required food items, he also acknowledges that when the policy changed in 2013, he had access to those items via a communal plate.  (Scolman decl., dkt. #42, ¶ 26.)  Likewise, although Aiello states that he was unable to celebrate the Seder ritual as he had previously, he admits that the

---

[9] Plaintiffs also argue that this ritual, traditionally conducted at the outset of Passover, was improperly delayed, since Jewish volunteers cannot travel on the first two days of Passover, but fail to offer any evidence that this delay in carrying out the Seder ritual constitutes a substantial burden on their religious practice, just that they were forced to celebrate at a different time.

communal Seder plate was available to him.  (Aiello decl., dkt. #41, ¶¶ 23-24.)  These admissions establish that WCI's switch to a communal Seder plate still allowed them access to food necessary for the Seder ritual.  While plaintiffs' statements certainly establish their dissatisfaction with the reduced *amount* of food items on the Seder plate made available to each inmate, they fail to show this policy placed a substantial burden on their religious exercise.

These facts stand in contrast to those of other inmates that were completely denied foods with religious significance.  In *Schlemm*, for example, the Seventh Circuit reversed this court's conclusion that a Native American inmate had not shown a substantial burden after the prison refused to provide game meat, a traditional food eaten at an annual celebration known as the Ghost Feast.  784 F.3d 362.  In finding summary judgment inappropriate, the Seventh Circuit noted that the two other circuit courts found proof of a prison's complete denial of access to traditional foods for a religious celebration precluded entry of summary judgment in defendant's favor.  *Id.* at 365 (citing *Haight v. Thompson*, 763 F.3d 554, 564-67 (6th Cir. 2014) (bar on certain traditional Native American foods), and *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1319-20 (10th Cir. 2010) (denial of halal meat for Islamic feast)).

Plaintiffs' facts are also distinguishable from those recently addressed by this court in *Tatum v. Meisner*, No. 13-cv-44-wmc, 2016 WL 323682 (W.D. Wis. Jan. 26, 2016). Tatum was denied a diet that aligned with the Nation of Islam ("NOI") diet.  In particular, he requested a specific diet consisting of one meal per day and delivered at a particular time, which included certain required items and excluded certain prohibited

21

items.  This court held that Tatum had submitted sufficient evidence to preclude entry of summary judgment for defendants on his claim of a substantial burden on religious rights, rejecting arguments that Tatum could simply have abstained from eating the prohibited foods, that he could purchase the desired foods from the canteen or commissary, and that RLUIPA does not require the government to provide specific foods. *Id.* at *7-*8.

Unlike in *Schlemm* and *Tatum*, plaintiffs here have not been denied traditional Seder plate food items.  Rather, they are now provided a donated, communal plate, rather than individual plates.  As they neither claim that eating a small quantity of Seder food plate items is necessary to carrying out this ritual (under Jewish tradition or their personal understanding or practice of this tradition), nor presented evidence that the communal Seder plate precludes them from carrying out the eating component of the ritual, plaintiffs fail to make a *prima facie* case that the 2013-2015 switch to a communal Seder plate created a substantial burden on their religious beliefs.

The result is the same under the new policy.  Effective January 1, 2016, defendants adopted a policy that permits inmates to purchase food items that make up their individual Seder plate, and if there is no volunteer to perform the ritual, they may eat that food in their cells.  It provides as follows:

1.  Inmates shall submit a DOC-2075 Request for new Religious Practice on Property at least 90-days in advance of the event date, and must include the following details:
    a.  Specific ceremonial food item(s) requested;
    b.  Religious/spiritual/ceremonial significance;
    c.  Source(s) of foot items from commercial vendors;
    d.  Individual portion cost;
    e.  Delivery method and charges;

       f.   Possible substitutions if preferred foods are not approved or are unavailable.

2.   Ceremonial food items shall serve the purpose of addressing the inmate's individual sincerely held religious belief that consumption is a required component of participation/completion of the specific religious observance event.

       a.   Ceremonial food items must be prepared, cooked, packaged and delivered by a non-DOC, commercial source.

       b.   Exact replication of typical community practices may not be possible due to limitations of prison security procedures, food storage capacity, preparation requirements, event time/space, etc.

       c.   Inmate may be asked to offer a least restrictive alternative, if facility is unable to accommodate requested item.

DAI Policy # 309.61.03(F).

Plaintiffs argue the new policy places "an onerous obligation on prisoners" by requiring "at least" 90 days before Passover begins, that the prisoner:  fill out a form; provide an order form for a commercial food vendor; state the reasons the food items are necessary; and state the method of delivery.   Plaintiffs further claim that because this policy is "untested," they should not be subject to it.   In the end, however, they again provide no evidence that the policy is unworkable, much less substantially burden their religious beliefs.

Instead, plaintiffs state in their reply brief that plaintiff Aiello asked a corrections program supervisor for guidance on this policy, and the supervisor would only refer him to a website that apparently provides the necessary information.   This statement alone does not create a genuine issue of material fact suggesting that the new policy creates a substantial burden.   In particular, Aiello fails to show that the website was unhelpful or inadequate, nor even indicates what information the website contains.   (Pl. Reply and Resp., dkt. #61, at 10.)   Thus, on this record, it is unclear that plaintiffs face *any* substantial hurdles in obtaining the information required to fill out the request form.

Additionally, although plaintiffs take issue with the 90-day advance notice requirement, they have not shown that the 60-day notice requirement under the old policy imposed any kind of meaningful hurdle.  Given that this is an annual ritual with set dates, plaintiffs' complaint about an additional 30-day notice requirement does not permit an inference that plaintiffs now face a significant burden in obtaining the necessary food items for the Seder ritual.

While these plaintiffs have failed to put forth evidence to challenge the new policy, the court does not find that the new policy would necessarily pass muster under RLUIPA under a more fulsome examination, particularly after having an opportunity to document how it actually works in practice.  *Schlemm*, 784 F.3d at 365 ("The Act requires prisons to change their rules to accommodate religious practices; rules' existence is not a compelling obstacle to change.").  The 2016 Seder ritual was scheduled to begin on April 22, 2016, and so it is likely that Aiello has made attempts to obtain Seder plate items under the new policy.  If he has learned that the new policy is, in fact, unworkable, plaintiffs, with the assistance of counsel, may submit a motion for reconsideration based on new evidence.  Yet as the evidence currently stands, plaintiffs have not submitted evidence that the new policy creates a substantial burden on an inmate's ability to obtain Seder food items.  Accordingly, summary judgment in defendants' favor on both the RLUIPA and Free Exercise claims premised on the Seder plate is appropriate.[10]

---

[10]  Since Scolman stated in his deposition that he had no plan to convert back from Paganism to Judaism, and did not plan to participate in any future Seders, he obviously has no basis to challenge the 2016 policy.  Similarly, although the court may reconsider Aiello's RLUIPA claim, his Free Exercise claim cannot be salvaged.  Regardless of the substantial burden finding,

### C.   Kosher Meals

Since Aiello failed to exhaust his administrative appeal of this issue (dkt. #26), Scolman is the only remaining plaintiff challenging the denial of two hot Kosher meals per day.  Scolman asserts claims under RLUIPA and the Free Exercise Clause, as well as under the First Amendment's Establishment Clause.  As for the RLUIPA and Free Exercise Clause, plaintiff failed to submit facts showing that the change in the Kosher meal plan substantially burdened his ability to keep kosher, instead only relying on unreasonable inferences.[11]  The only theory that may have even arguable merit on this record is Scolman's assertion that the Kosher diet is nutritionally deficient, leaving him feeling hungry enough to need to supplement his meals with food items from the canteen.  *See Nelson v. Miller*, 570 F.3d 868, 880 (7th Cir. 2009) ("A prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.").  Specifically, Scolman avers that the new diet is not nutritionally sufficient because it does not add up to 2000 calories per day, but, in fact, the evidence he submitted establishes the opposite.

Although Scolman acknowledges being neither a dietitian nor nutritionist, he purports to dispute defendants' evidence that the average daily nutritional breakdown of

---

defendants are entitled to qualified immunity as to the Free Exercise claim, as plaintiffs have not pointed to any case law clearly establishing a constitutional right to individualized Seder plates.

[11] Scolman's RLUIPA claim falls away regardless since its only relief is prospective, and his recent conversion to Paganism renders such relief moot.

the current Kosher diet is between 2500 and 2750 calories per day.[12]  Scolman points

out that defendants cite to an out-of-date menu and submits a different, more current

menu.  (*See* Exs. to Schutt decl., dkt. #48-1, #48-1, #48-3.)  While Scolman is correct

that the menu defendants rely on is from 2002, the menu he submits actually proves

defendants' point, since this menu, which appears to tracks the nutritional value of the

Kosher meals from November 2014, in fact lists daily total calories between 2543 and

2858.

The gist of Scolman's remaining position is that the revised Kosher diet is

undesirable in comparison to the previous diet, not that it coerces him to violate his

religious beliefs.  For example, Scolman states that as a result of changes in both the

available prayer services and diet, he "became frustrated and abandoned the Jewish faith

and signed up for the Pagan URG, which had weekly congregate services and the plant-

based religious diet that was not loaded with crackers and packets of jelly and peanut

butter, which had on the continual bases two to three hot meals a day."  (Scolman decl.,

dkt. #42, ¶ 32.)[13]  A mere "preference or convenience is not the standard" for assessing

the existence of a substantial burden on religious beliefs.  *Mutawakkil v. Huibregtse*, 735

F.3d 524, 527 (7th Cir. 2013) (inmate desiring to be called by his spiritual name did not

show a substantial burden).  As importantly, Scolman has submitted no facts suggesting

that even his own, personal understanding of Judaism requires that the Kosher diet

---

[12] The evidence offered at summary judgment reflects a breakdown per meal averaging 882 calories at breakfast, 830 calories at lunch, and 1042 calories at dinner.  (Def.'s PFOF, dkt. #55, ¶¶ 79-82.)

[13] Scolman does not explicitly state that he prefers the Pagan meal plan because it includes hot meals and a more palatable diet, but the inference is strong,

include a warm evening meal, nor that it prohibits him from eating foods currently included in the evening meal, nor compels eating foods now excluded.[14]

Again, these facts differ from those considered by this court in *Tatum*.  Tatum had been denied the specific foods that he stated were a *required* part of his religious practices.  *Tatum*, 2016 WL 323682, at *8.  Tatum was also unable to obtain sufficient calories daily by eating only the items he was provided that were not prohibited by his religion.  *Id*.  In contrast, Scolman neither claims that he was denied any foods required for a Kosher diet, nor that the Kosher diet included prohibited food items.  Scolman has not, therefore, made a *prima facie* showing that the changes in the Kosher diet substantially burdened his ability to practice his Jewish faith.  Thus, summary judgment will be entered in favor of defendants on plaintiff Scolman's RLUIPA and Free Exercise clause claims.

This leaves Scolman's claim under the Establishment Clause.  Scolman appears to challenge the change in the Kosher diet at WCI when apparently no change was made to the Halal and plant-based diets.  More specifically, Scolman argues that this change in the Kosher diet shows the defendants favor Muslim inmates, or inmates who have selected a plant-based diet for religious reasons, over Jewish inmates.

Certainly, the Establishment Clause "prohibits the government from favoring one religion over another without a legitimate secular reason."  *Kaufman v. McCaughtry,* 419 F.3d 678, 683 (7th Cir. 2005).  The Equal Protection Clause also prohibits state actors

---

[14] For example, the analysis might have changed if, for instance, Scolman had averred that he had a food allergy or other health-related issue that made him unable to eat the revised Kosher diet, or if the Kosher diet prohibits eating peanut butter.

from purposefully treating an individual differently because of his membership in a particular class without cause. *DeWalt v. Carter,* 224 F.3d 607, 618 (7th Cir. 2000). Under both theories, however, a legitimate secular reason for any difference in treatment is fatal to an Establishment Clause claim. *Kaufman,* 419 F.3d at 683; *Reed v. Faulkner,* 842 F.2d 960, 962 (7th Cir. 1988) (difference in treatment must only be non-arbitrary).

Here, Scolman submitted no evidence that the defendants singled out the Kosher diet for special treatment *except for secular reasons.* The evidence he submitted consists of documents and correspondence among WCI and DOC staff related to the change in the Kosher diet. (Dkt. #41-5, at DOC-0146, -0218, -0220, -0241, -0303, -0362, -0375-76.) In contrast to Scolman's characterizations, these documents repeatedly state that the reasons for the change were to: (1) make the Kosher diet consistent with the caloric and nutritional values of other religious diets; (2) reduce costs; and (3) eliminate powdered milk for security reasons. The reasons for these changes do not favor a certain religion; they actually indicate that the change was made to treat different religious diets *more* similarly.

Further, defendants have indicated, and Scolman has not rebutted, that the reason that the Halal diet includes warm meals is because the Halal dietary restrictions differ from those of the Kosher diet, and that while the DOC's kitchens are equipped to prepare warm Halal meals, they are not equipped to do the same for Kosher meals. Scolman has thus failed to establish that defendants purposefully targeted Jewish inmates in changing the Kosher diet. *See Hearn v. Kennell,* 433 Fed. Appx. 483, 484 (7th Cir.

28

2011) ("[S]ummary judgment was proper because [plaintiff] put forth no evidence that the prison's decision to serve Kosher meal but not Halal meal was motivated by intentional or purposeful discrimination.").

Even if plaintiff Scolman advanced evidence of permitting a finding of substantial burden or intentional or purposeful discrimination, defendants are entitled to qualified immunity on all of his First Amendment claims related to the Kosher diet.  Scolman cites no cases indicating that there is a clearly established right to the type of Kosher diet he is seeking; nor any cases establishing that prisons may not distinguish among religious diets for secular reasons.  Indeed, existing case law is generally to the contrary.  *See Nelson*, 570 F.3d at 881 (affirming district court's finding that defendant's requirement that Catholic plaintiff provide documentation of his meatless Friday religious diet request, where no such requirement was made for Muslim inmates, did not violate The First Amendment because it served a secular purpose).  Accordingly, summary judgment in defendants' favor is appropriate at to Scolman's First Amendment Kosher meal claims as well.

## II.    Motion for Assistance in Recruiting Counsel (dkt. #27) and Trial

To summarize, the only remaining issue at trial is plaintiff Aiello's RLUIPA claim that the ban on inmate-led Shabbat services violates RLUIPA.  Defendants will be granted summary judgment as to plaintiffs' RLUIPA and First Amendment claims related to the Seder ritual and the change in the Kosher diets.  This leaves two remaining issues: (1) resolution of plaintiff's motion for assistance in recruiting counsel and (2) determining how trial will proceed.

First, plaintiffs renewed a motion for assistance in recruiting counsel.  (Dkt. #27.)
In it, they submit one letter from an attorney declining to represent them and refer the
court to the brief accompanying their prior motion.  Aiello also explains that he would
like to proceed on this matter as a class action, but only attorneys, not *pro se* plaintiffs,
may represent a proposed class.  Aiello further asserts that the subject matter of this case
exceeds his expertise, especially because he does not feel equipped to rebut the
statements in the defendants' affidavits.

While Aiello submitted just one letter from an attorney declining to represent
them, they indicate that they sought representation from a total of two law firms and the
ACLU of Wisconsin.  As the court is satisfied that Aiello made reasonable efforts to
secure counsel, the next question is whether the complexities of proving his case at trial
appear exceed his ability to litigate it.  *See Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir.
2007) (the central question in deciding whether to request counsel for an indigent civil
litigant is "whether the difficulty of the case – factually and legally – exceeds the
particular plaintiff's capacity as a layperson to coherently present it to the judge or jury
himself").

The issue currently remaining for a bench trial relates to whether the ban on
inmate-led groups violates RLUIPA, at least in manageable, smaller groups.  As noted
above, Aiello is concerned with his ability to rebut defendants' evidence, and given that
proving their claim may require expert testimony, it would be unfair not to permit him
the opportunity to do so with the assistance of counsel.  Furthermore, Aiello would like
to proceed as a class, and although the court makes no comment on whether this action

is appropriate for class certification, the assistance of counsel will be necessary for him to pursue it.   Moreover, as the court noted above, Aiello's claims related to the availability of the Seder plate items in 2016 under the DOC's new policy may a motion to reconsider, and the assistance of counsel will likely streamline this process.   Finally, it seems more likely that the parties may have more meaningful settlement discussions with the plaintiff represented by counsel.

As to the trial, under RLUIPA, Aiello is limited to declaratory and injunctive relief. *See Nelson v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009) (monetary damages are not available as a remedy under RLUIPA).   As his claim is limited to equitable relief, he has no right to a jury trial.   *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 966 (7th Cir. 2004) ("There is no right to a jury where the only remedies sought (or available) are equitable.").   The court will therefore hold a bench trial on plaintiffs' RLUIPA claim related to Shabbat services.   *See* Fed. R. Civ. P. 39(a)(2) ("The trial on all issues so demanded must be by jury unless … the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.").   Once counsel for Aiello has been recruited, the court will promptly schedule a telephonic conference to discuss whether he will pursue a class action, the trial schedule and any other outstanding issues.

ORDER

IT IS ORDERED that:

(1) Plaintiffs' renewed motion for assistance in recruiting counsel (dkt. #27) is GRANTED.

(2) Plaintiffs' motion for summary judgment (dkt. #37) is DENIED.

(3) Defendants' motion for summary judgment (dkt. #53) is GRANTED in part and DENIED in part, as discussed above.

(4) This matter continues to be STAYED until counsel has been recruited, at which point the court will schedule a telephonic conference.

Entered this 14th day of September, 2016.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge